DEWEY ROBISON, By Next Friend, v. FLOESCH CONSTRUCTION COMPANY, Appellant.

**Division One, December 19, 1921.**

1. **JUDGMENT: Against Infant: Fraud.** An infant cannot avoid a judgment or decree against him merely on the ground of infancy, nor can he impeach such a judgment or decree by an original bill except upon grounds that would be available to an adult, such as fraud.

2. ———: ———: **Fraudulent Representations.** A fraudulent representation is a false statement relating to a matter of fact made with intent to deceive; and where the petition charges only fraudulent representations, and the evidence wholly fails to show that any untrue statement of fact was made by defendant, either in negotiating the settlement with the infant plaintiff or in procuring the entry of a formal judgment against him by the justice of the peace, said judgment cannot be set aside on such ground. But a petition charging fraudulent representations may contain other allegations of fact which in law amount to fraud, and if they are supported by the proof the judgment will be set aside.

3. ———: ———: **By Consent of Minor and Next Friend: Duty of Court: Perfunctory Hearing.** In a suit instituted by a minor by his next friend a judgment may be rendered that will be valid and binding. But such a judgment cannot be based merely on the consent of the minor, for he is without discretion, nor on that of a next friend, for he is not invested with either the power or the duty so to consent. The court in such case is charged with the duty of protecting the minor's interest, and it is only when its judgment is based upon facts judicially ascertained, that is, upon a real and not a perfunctory hearing, that its judgment is binding upon the minor.

4. ———: ———: **Contract of Settlement: Colorable Hearing: Screen to Avoid Incapacity to Settle.** A contract of settlement of a claim for damages for personal injuries, even after it becomes executed, a minor has the right to disaffirm and repudiate at any time within his minority and within a reasonable time after coming of legal age; and this right the tortfeasor cannot cut off, or make the contract absolute and final, by cloaking the settlement in the guise of a legal proceeding and a judgment which amount to a mere con-

Robison v. Construction Company.

trivance to foreclose the minor's right to disaffirm the settlement. Where the agent of the tortfeasor agreed with the minor to pay him $250 in settlement of his claim, suggested a suit by his next friend and a judgment as the means of bringing it about, suggested as a next friend a gentleman unknown to the minor, drew up the petition for the appointment of a next friend, a statement of the minor's cause of action, a waiver of service of process and entry of appearance by defendant, a stipulation that the cause be set down for trial and tried the same day and for a judgment entry, and the suggested next friend signed such papers as he was requested to sign, and then the agent presented the papers to a justice of the peace, who entered a judgment reciting the appearance of the parties, a waiver, a hearing and submission on the evidence, a finding for plaintiff in the sum of $250, and an acknowledgment and satisfaction of the judgment in open court, all in the absence of counsel or relatives or friends of the minor, there was no judicial ascertainment of the facts, the hearing was perfunctory, the whole proceeding was colorable from beginning to end, and was a mere screen contrived to conceal the real transaction, namely, the contract of settlement and release between the minor and defendant, and the judgment was fraudulent; and these facts being alleged and amply proven, the judgment was properly set aside.

5. ———: ———: **Taking Advantage.** It is considered fraudulent for a tortfeasor to take advantage of the incompetency of an infant to protect his own interest, and a judgment of settlement so obtained should be treated as fraudulent.

6. **NEGLIGENCE: Contributory: Matter of Law: Mistake: Failure to Use Implement.** Where plaintiff testified that when he saw the boom of the dragline excavator, used in constructing a drainage ditch and levee, returning towards the cabin of the machine, he tried, being instructed by the operator to descend to the ground, to go down by the movable ladder provided for that purpose and could not find it, the time being dark night, without lights, he cannot as a matter of law be held to be guilty of contributory negligence because he attempted to climb down by the frame work instead of by the ladder; and being unfamiliar with his surroundings and the movements of the machine, he cannot as a matter of law be held to be negligent because he was mistaken as to which corner of the machine the ladder was suspended.

7. ———: ———: ———: **Warning: Unwillingly Disregarded.** Even if the statement of an experienced pit foreman to the inexperienced plaintiff that he always descended from the cabin of the dragline machine, used in digging a drainage ditch, on the outside of the framework, could be construed as a warning not to go down on

the inside, plaintiff could not be held guilty of contributory neg·
ligence as a matter of law where he did not willingly disregard the
warning, but at first was not attempting to go down on the frame
at all, but was hunting for the movable ladder, but being unable
to find it and the time being dark night he suddenly realized that
he was in peril from the returning boom, and went inside the frame
work to avoid being crushed, and there came in contact with a
pulley.

8. ———: ———: ———: **Imminent Peril.** An inexperienced employee
about dangerous machinery who, without fault on his own part,
finds himself in a position of peril, is not required to reason calmly,
and if in an attempt to preserve his life he takes the wrong course
and is injured, he is not chargeable as a matter of law with con-
tributory negligence; but whether, in so doing, he failed to exer-
cise that degree of care that an ordinarily prudent man of his ex-
perience would have exercised under the circumstances is a ques-
tion for the jury.

Appeal from Cape Girardeau Court of Common Pleas.—
*Hon. John A. Snider*, Judge.

Affirmed.

*Oliver & Oliver* for appellant.

(1) The judgment of the justice court, having been
made in open court in the presence of both parties, will
not be vacated nor declared void except upon the most
positive, clear and satisfactory proof of fraud in its
procurement, and that it was a fraud upon the court as
well as upon the other party to the suit. No such proof
was made in this case. Leiber v. Leiber, 239 Mo. 31, 45;
McDonald v. McDonald, 242 Mo. 172; Payne v. O'Shea,
84 Mo. 129; 23 Cyc. 726, 920, 1049; Obermeyer v. Einstein,
62 Mo. 341; Oxley Stave Co. v. Butler Co., 121 Mo. 630;
Murphy v. DeFrance, 101 Mo. 151; Hancock v. Blackwell,
139 Mo. 453; Cantrell v. Johnson, 236 Mo. 575, 600; Wolf
v. Brooks, 177 S. W. 337. In this case plaintiff neither
pleaded nor proved any material facts represented to
plaintiff by defendant, false or otherwise. Coal Co. v.
Holterman, 254 Mo. 639; Southern Dev. Co. v. Silva, 125
S. W. 250. (2) "Judgment are impeachable only for

fraud, 'extrinsic to the merits of the case.' 'They are not impeachable for fraud relating to the merits of the case.' " Cantwell v. Johnson, 236 Mo. 575, 601; Ritche v. McMullen, 79 Fed. 522, 531; McDonald v. McDonald, 242 Mo. 172; Leiber v. Leiber, 239 Mo. 42; Railroad v. Mirriclees, 182 Mo. 140. (3) Defendant's demurrer to plaintiff's petition should have been sustained. (a) There is no allegation of diligence on the part of plaintiff nor that he was prevented or hindered by any act of defendant in exercising such diligence. Carolus v. Koch, 72 Mo. 645; Railroad v. Mirrielees, 182 Mo. 140; Cantwell v. Johnson, 236 Mo. 600; 23 Cyc. 1042. (b) There is no averment of any artifice, trick, promise or concealment of any fact whereby plaintiff was deceived. Railroad v. Mirrielees, 182 Mo. 140; Traction Co. v. Dent, 140 S. W. 610. (c) The bill nowhere sets out any facts which plaintiff now knows which he did not know at the time of the former trial. Carolus v. Koch, 72 Mo. 645; Railroad v. Mirrielees, 182 Mo. 140; 23 Cyc. 1022. (d) There is no allegation of what facts, if any, were misrepresented. It is necessary that the facts and not conclusions be set out. Travelers Protective Assn. v. Gilbert, 111 Fed. 269; Wilkinson v. McGee, 265 Mo. 580; 23 Cyc. 1040, 1041; Magnuson v. Casualty Co., 125 Mo. App. 206; Carroll v. United Rys., 157 Mo. App. 249. (e) The failure of the petition to plead a tender of the amount received under the former judgment and settlement, prior to the institution of this suit, is fatal. Reid v. St. Louis Railroad Co., 187 S. W. (Mo.) 15; Althoff v. St. Louis Transit Co., 204 Mo. 170; Wessel v. Waltke Co., 196 Mo. App. 582. (4) If any wrong is done, "although rendered in his favor, as if for a less sum than he is entitled to the tribunal where the wrong was done should furnish the relief." Downing v. Still, 43 Mo. 318; Blessing v. Varnish Co., 107 Atl. 601. (5) When a money judgment is paid, the judgment is performed and that is the end of it. It will not be reopened by that or a higher court whether obtained by fraud or not. Davis v. Blair, 88 Mo. App. 372; Weston v. Clark, 37 Mo. 568; 23 Cyc. 893, 1465. (6) Neither coveture nor infancy are grounds for equitable interference with

a judgment, the defect not being jurisdictional. Wyman v. Hardwick, 52 Mo. App. 621; 23 Cyc. 993. (7) "Equity will no entertain a bill for relief against a judgment, founded on any matters which were tried and determined in the action at law, or which were there so put in issue that they might have been adjudicated, however unjust the judgment may appear to be." 23 Cyc. 1017; Cantrell v. Johnson, 236 Mo. 601; Summer v. Whitley, 1 Mo. 708; Matson v. Field, 10 Mo. 100. (8) The plaintiff was so plainly guilty of contributory negligence that it was the duty of the trial court to have directed a verdict for defendant. Wood v. St. Louis Railroad, 187 S. W. (Mo.) 11; Boesel v. Wells Fargo & Co., 260 Mo. 463; Henry v. Railroad, 141 Mo. App. 351; Carson v. Railroad, 96 Iowa, 583, 65 N. W. 831. Plaintiff's own testimony proves his contributory negligence. (a) He knew there was a ladder on the framework; he had used it that very night. (b) The ladder was at the same place when he was hurt as it was when he went up it that same night. (c) When he stepped on to the framework he did not look for the ladder. (d) When he was on the apron—a step higher up—he says there was no use to look. (e) He went to a corner of the framework and sitting on it with his legs on the outside of the frame, felt for the ladder with his legs; not feeling it, he did the same thing on the other side of the same corner. (f) It had been suggested to him by his foreman that same night—less than six hours before —not to go down on the inside of the framework—that he always went down on the outside. Notwithstanding this admonition when he saw the boom approaching him, he tried to get his body and legs down on the inside of the framework. (g) He got his body, arms, head and one leg inside. His only excuse for not getting both legs down into this place which he thought was safe was that he didn't have time. Henry v. Railroad, 141 Mo. App. 358. (9) Plaintiff thought the fair lead shive would clear his leg and that he was therefore safe with this one leg left up on the beam of the framework. R. G. Nunn testified that plaintiff admitted this to him on October 7, 1918, and

plaintiff when he took the stand in rebuttal did not deny it. Under such conditions he cannot recover. Roesel v. Wells Fargo & Co., 260 Mo. 476; Henry v. Railroad, 141 Mo. App. 351. (10) Where there is an obviously safe and an obviously unsafe way to do a thing, both open to the plaintiff and he chooses the obviously unsafe and is injured, he cannot recover. Wolff v. Steel Co., 217 S. W. 571; McCarty v. Hood Hotel Co., 144 Mo. 397.

*Hardesty & Limbaugh* for respondent.

(1) The judgment of the justice having been rendered without a hearing, without any inquiry as to what was for the best interest of the plaintiff and without any judicial determination of the rights of the parties, and being for a sum grossly inadequate, was properly set aside on those grounds. (a) Equity will set aside judgments rendered in violation of the law of procedure by or against infants. Thornton v. Thornton, 27 Mo. 302; Sec. 1739, 1744, 1745, 1747, R. S. 1909; Scott v. Royston, 223 Mo. 568, 123 S. W. 454; Neenan v. St. Joseph, 126 Mo. 89; State ex rel. v. Gawronski, 110 Mo. App. 414; Weiss v. Coudrey, 102 Mo. App. 65; McMurtry v. Fairley, 194 Mo. 502. (b) That neither an infant nor anyone for him can consent to a judgment is one of the cardinal rules of such procedure. Revely v. Skinner, 33 Mo. 98; McClure v. Farthing, 51 Mo. 109; Collins v. Trotter, 81 Mo. 281; Tyler on Infan. and Covert, pp. 175, 211; Tuttle v. Garret, 15 Ill. 354; Holden v. Hearn, 1 Beav. 445; Le Bourgeoise v. McNamara, 82 Mo. 189. (c) In practically all jurisdictions, equity uniformly sets aside judgments rendered in violation of said rule and of the substantial rights of an infant. Mo. Pac. Ry. Co. v. Lasca, 99 Pac. 616; Kingsbury v. Buckner, 134 U. S. 650; Walsh v. Walsh, 116 Mass. 377; Tripp v. Gifford, 155 Mass. 108; Ewing v. Ferguson, 33 Gratt. 563; Cralle v. Meem, 8 Gratt. 530; Bank of Alexander v. Patton, 1 Rob. (Va.) 535; 1 Minor's Inst. 520, 521; 1 Dan. Ch. Pr. 189; Daingerfield v. Smith, 83 Va. 81; Ferrel v. Broadway, 126

N. C. 258, 261; Crapster v. Taylor, 74 Kan. 771; Pittsburg Ry. Co. v. Haley, 170 Ill. 610; Long v. Mulfurd, 17 Ohio St. 484; Waterman v. Lawrence, 19 Cal. 210; Kromer v. Friday, 10 Wash. 621; Gooch v. Green, 102 Ill. 507; Ralston v. Lohee. 8 Iowa, 17; Leslie v. Proctor & Gamble Mfg. Co., 102 Kan. 159; Tenn. Coal Co. v. Hayes, 97 Ala. 201; Burke v. Northern Pac. Ry. Co. 86 Wash. 37; Thompson v. Land Co., 168 U. S. 451; Rankin v. Schofield, 70 Ark. 83; Coal Co. v. Donaldson, 123 Ill. App. 196; Day v. Johnson, 32 Tex. Civ. App. 107; Knight v. Waggoner, 214 S. W. 690. (2) The infant's tender of the check prior to suit was unnecessary, defendant having failed to make legal delivery of same to him and he being powerless to make a legal tender except through the regular court procedure for infants. Ridgeway v. Herbert, 150 Mo. 606; Craig v. Van Bebber, 100 Mo. App. 584; 22 Cyc. 557-559; Coal Co. v. Donaldson, 123 Ill. App. 196; Mo. Pac. Ry. Co. v. Lasca, 99 Pac. 616; Tenn. Coal Co. v. Hayes, 97 Ala. 201; Leslie v. Proctor & G. M. Co., 102 Kan. 159; Lumber Co. v. Warner, 93 Mo. 388; Carrol v. Railway, 157 Mo. App. 247, 137 S. W. 303. (3) This action to set aside the judgment of the justice was brought in the proper court. Leslie v. Mfg. Co., 102 Kan. 159; 1 Black on Judgments, par. 297; Leith v. Shingleton, 42 Mo. App. 499; Langford v. City of Doniphan, 61 Mo. App. 288; Weiss v. Coudrey, 102 Mo. App. 65; Lillibridge v. Ross, 59 Mo. 217; Neenan v. City of St. Joseph, 126 Mo. 89. (4) The verdict of the jury should be upheld. Wellman v. Railway, 219 Mo. 126, 118 S. W. 31; O'Connell v. St. Louis Cable Co., 106 Mo. 482. (a) The court could not declare plaintiff guilty of contributory negligence as a matter of law. Dowling v. Allen & Co., 74 Mo. 13; Vanesler v. Moser Cigar Co., 108 Mo. App. 621; 26 Cyc. 1176; Ranson v. Union Depot Co., 142 Mo. App. 361, 126 S. W. 785; Hull v. Transfer Co., 135 Mo. App. 119, 115 S. W. 1054; McFern v. Gardner, 121 Mo. App. 1, 97 S. W. 972; Boyce v. Railway, 120 Mo. App. 168, 96 S. W. 670; Lang v. Railway, 115 Mo. App. 489, 91 S. W. 1012; Brown v. Railroad Co., 180 Pac. (Kansas) 211; Coal Co. v. Love, 153 Ky. 323, 155 S. W.

746. (b) The court could not declare defendant free of negligence as a matter of law. Nash v. Brick Co., 109 Mo. App. 600; Vanesler v. Moser Cigar Co., 108 Mo. App. 621; Dowling v. Allen & Co., 75 Mo. 13; 26 Cyc. 1176; Wellman v. Railroad, 219 Mo. 126; O'Connell v. St. Louis Cable Co., 106 Mo. 482.

RAGLAND, C.—Plaintiff, a minor, brought this suit by his next friend, November 4, 1914, to recover for personal injuries. He recovered judgment for $10,000 and defendant appeals.

There is but little conflict in the evidence. Where, however, it is not in accord, the facts will be stated from the standpoint of plaintiff's evidence, because appellant's only contention with respect to the trial on the merits is that the evidence discloses that plaintiff was guilty of contributory negligence as a matter of law.

In September, 1918, the defendant, a New York corporation, was engaged in the construction of ditches and levees in Southeast Missouri, and maintained offices for the management of its business in Cape Girardeau. It used in this work large machines called dragline excavators. At the time just mentioned one of these machines was operating day and night near Greenbrier, in Bollinger County. This machine consisted of two parts, the base and the cabin. The base was a steel frame work 24 feet square and 10 feet high, which stood on wheels similar to those of a railroad box car and which ran on a steel track. On the top of the frame work was a circular track upon which rested the cabin. This cabin was of rectangular shape and looked very much like a railroad freight car. It housed the principal part of the machine used to operate the excavator. A steel boom 100 feet in length extended from one end of the cabin, and from the extreme end of the boom there swung a bucket or dipper. When the machine was in operation the dipper was lowered to the ground where it scooped up a dipper of earth. The loaded dipper was then raised from the ground and the upper part or the cabin of the machine, together with

the boom carrying the loaded dipper, was made to turn, at the time of the operation in question, in approximately a half circle, while the base of the machine remained stationary. By this means the earth was carried away from the ditch that was being dug and deposited in a different place, forming a levee. The machine was operated by electric power generated in the city of Cape Girardeau and carried over high tension wires. This electric current passed through a transformer and then to the machine. The operator's position was in the cabin near the front end. In order to move the end of the boom from a position over the ditch to a position over the levee, he pulled a lever and the entire cabin part of the machine turned to the required distance. Just underneath the bottom of the boom where it was attached to the cabin, there was a pulley, around which the cable controlling the bucket passed before going to the drum inside the cabin. Just outside the door of the cabin and down a step lower was a small semi-circular platform, called the apron or porch. It was another step from this apron down to the top of the frame work. There were large steel I-beams or girders inside of the top of the frame work, which ran diagonally across the square of the frame. Just before they reached a corner they divided, so that instead of running directly to the corner one-half of the beam went to one side of the corner and the other half to the other side, leaving a space of something like two feet in width between the two parts of the beam at the corner. There was a ladder made of iron or steel which hooked over the outside edge of the frame work, and was always kept at or near one corner of the frame work. It was shifted from one corner to another as the convenience of the men using it required.

The machine was lighted with some thirty-odd incandescent electric lights; four clusters of four each on the boom; some six or eight in the cabin; and eight underneath, two at each corner of the frame work. The · clusters of lights on the boom had reflectors behind them

which caused their rays to be thrown downward. The cabin had two doors and three windows on each side, and there was a large opening in front.

On the night of September 9, 1918, the machine in question was being run by a crew of five men: the operator, the oiler and three pit men. The operator manipulated the levers in operating the machine; the oiler kept the machinery in the cabin oiled and greased; and the three pit men, a foreman and two laborers, took up the track in the rear of the machine and put it down in front when necessary for the machine to move forward. These latter also oiled the bucket, removed obstacles in the way of the advance of the machine and performed such other work as was required to be done on the ground. All the oil and grease were kept in the cabin, and the pit men working on a night shift customarily ate their midnight lunch there. The operator was the foreman in charge of both machine and crew.

On the night just mentioned, plaintiff was one of defendant's crew working as pit man. He was nineteen years of age and had worked on a farm all of his life. Between cropping seasons he had done other kinds of work, such as cutting logs and clearing land. On one occasion he worked a month and a half at a saw mill. He had had no experience whatever in working around or about defendant's excavator and had no previous knowledge of the manner of its operation, except such as he gained from passing it occasionally during the time it had been operating in the vicinity of his home. He had worked but one night previously, and then the machine was not run at all because out of order. The workmen spent the entire night repairing it. Plaintiff began at seven o'clock in the evening. At midnight the machine was stopped for a few minutes while the operator ate his lunch. During this interval the pit men oiled the bucket bearings. When they had finished, the pit foreman directed the plaintiff to take the oil back to the cabin where it was regularly kept. Plaintiff took the oil to the cabin and stayed to eat his lunch. After

finishing he was told by the operator, who had again started the machine, to tighten the jacks that steadied the frame work. In order for plaintiff to do that, it was necessary for him to go from the cabin to the ground. In the meantime the machine was kept running.

In getting up and down from the cabin, the workmen sometimes used the ladder; at other times they climbed the frame work or let themselves down by the same means. Plaintiff had been up and down twice before he ate his lunch that night, but not when the machine was running. The first time he went up on a ladder and the next time he "went up on a corner." On one of these occasions, in getting down, he got down on the inside of the frame work, and the pit foreman said to him: "I always get down on the outside." Prior to his injury plaintiff had never received any other instruction or warning with respect to getting down from the cabin, except that he had been cautioned in a general way not to come into contact with the electric cables on the ground and up in the machine. The top of the frame work was about twelve feet above the general level of the ground.

When plaintiff started down from the cabin to tighten the jacks, he stepped out of the door down on to the apron or porch. It was a dark night and there was not sufficient light thrown from the cabin or from the lights on the other parts of the machine to enable him to discover the location of the ladder. He waited until the dipper picked up its load of earth and started with it, then stepped down on the frame and walked toward the corner where he thought the ladder was. The boom was then moving away from him. When he got to the corner of the frame he let himself down and felt along the side with his feet for the ladder. Not finding it, he got around on the other side of the corner and felt there, but there was no ladder. He then looked around and saw the boom coming toward him; he climbed back upon the frame work, intending to get back on the apron. While still on his knees and before he could get in a

standing position, it appeared to him that he would not
have sufficient time to get up and onto the apron before
the boom reached him. The opening between the prongs
of the diagonal I-beam just inside the corner of the
frame was right in front of him and seemed the only
safe avenue of escape, and into that he went head fore-
most. He succeeded in getting all of his body through
except his left leg, which the pulley underneath the low-
er end of the boom caught and crushed against the upper
part of the frame work.

On cross-examination he said in part: "When I
started down in there I went head first. I was on top
of these girders. If I had slid down on the outside of
the frame work instead .of trying to conceal myself on
the inside of this prong, I would have had to have dropped
about twelve feet to the ground, and besides there
were some live wires there at that time. The wires were
insulated but worn. . . . I chose that side of. the
machine to climb down. I don't remember whether that
was the same side I climbed up or not. The ladder was
not at the corner. I had gone up the ladder that same
night; I didn't have time to chose any other corner only
that one. . . . When the dipper got its load and
started I stepped off there where I thought the ladder
was. . . The boom was not coming toward me when
I stepped off, it was going the other way. When it came
back it hit my leg. It takes a minute for it to do that.
I was on that girder during that time, right there at the
corner. I got down and felt for the ladder, but it was
not there, and I went to the other. corner, and by that
time it was coming back. I did not wait for it to come
back, it just came back. I was still there." Asked why
he did not look for the ladder instead of getting down
and feeling for it with his feet, he said: "No use to look;
you couldn't see it." In reply to a further question,
he said: "I tried to go down on the ladder. I was not
trying to go down off the machine by going down on the
inside when I was injured." As a matter of fact, the
ladder was at the same place when plaintiff was hurt
that it was when he went up on it that same night.

Plaintiff's injury consisted of a compound fracture of the left leg, the femur being broken about eight inches below the hip. He was taken to a hospital at Cape Girardeau where the fracture was reduced and his leg put in a swing splint. Some six weeks later it was discovered that the parts of the bone were not uniting; an incision was made and a plate was put on the bone to assist in bring about a union. Still later, infection set up, and it became necessary to amputate the leg.

On October 7, 1918, while plaintiff was still in the hospital and before there was any indication that he was not making a normal recovery from his injury, he was visited by Mr. L. W. Mees, an attorney representing the defendant. Mees introduced himself and stated that he had come to make a settlement. Plaintiff told him that he was not of age and that a settlement would have to be made with his father. Mees said that it was not necessary to have his father; that as he was over fourteen years of age he could have a next friend appointed and through him a settlement could be effected by means of a friendly suit. He then asked plaintiff how much he wanted and the latter said he thought he ought to have $350. Mees, after questioning the plaintiff at some length as to how the accident occurred, told him that he did not think the company at fault, but that he would pay him $250 and his hospital fees and doctor bills anyway. Plaintiff made no immediate response and Mees started to go, when plaintiff said: "Well mister, I will take that $250." He was then asked whom he wanted appointed next friend, but plaintiff knew no one in Cape Girardeau. Mees suggested Mr. S. M. Carter, secretary of a trust company there, and plaintiff made no objection, in fact said nothing. Mees then went away and prepared what he deemed the necessary papers: a petition for the appointment of a next friend; a statement of the cause of action laying plaintiff's damages at the sum of $250; the consent of Carter to act as next friend; a waiver of service of process and entry of appearance by defendant; a stipulation that the cause be set down

for trial and tried on that day; and a judgment entry. He then, in company with defendant's local manager, went to Mr. Carter's place of business and requested him to act as next friend for a young man, nineteen or twenty years old, who had been injured on one of their dragline machines. They told Carter "a little bit how the young man got hurt;" that they were going to pay him $250 and his hospital fees and doctor bills; that they did not think there was any liability, but that the company would rather pay the $250 than be annoyed with a law suit. Carter accepted their statement and after reading the papers, signed such of them as Mees requested without further investigation.

Mees next went to a justice of the peace and told him that he wanted him to go the hospital and take up a friendly suit. The justice consented and they went at once to the hospital. On arriving there the justice was introduced to the plaintiff. He asked plaintiff where he came from and how he got hurt. In answer to the latter question plaintiff told him that he got hurt on a dragline machine. Mees asked plaintiff if he still wanted the $250 in compromise and he replied that he did. Mees then said you must sign these papers. After plaintiff had signed the paper or papers presented to him, the justice asked: "Is this your free act?" and plaintiff said, "Yes." Mees then handed plaintiff a check for $250 and told him that the company would pay all of his expenses at the hospital and that he need not leave until he got well. He and the justice then left.

The judgment entry written in the justice's docket recited the appearance of the parties; the waiver of a jury; a hearing and submission on the evidence and "the receipt and releases of the parties;" a finding and judgment for plaintiff in the sum of $250; and an acknowledgment of satisfaction thereof in open court. Immediately under the judgment entry are the words, "Approved by," followed by the purported signatures of plaintiff and Carter as his next friend.

There is no contention that Mees, during the negotiation of the settlement, made any misstatement of fact to plaintiff, to Carter, or to the justice.

The petition is in two counts. The first is in equity and seeks to have the judgment of the justice of the peace set aside. The grounds on which the right to such relief is predicated is set forth in the petition as follows:

"On October 7, 1918, the defendant, by fraudulent representations made to plaintiff, induced him to acquiesce in the defendant's proposal to settle his claim for $250; that the defendant, through its own initiative and without the consent or approval of the plaintiff, secured the appointment of a next friend and caused to be instituted a suit by such next friend against the defendant and in behalf of the plaintiff for damages for the aforesaid injury; that said next friend was unknown to plaintiff and plaintiff never had an opportunity to see him or consult with him about said suit; that defendant prepared all the papers, pleadings and orders in said proceeding and filed the same with F. A. Kage, a justice of the peace within and for Cape Girardeau Township and County, Missouri, and fraudulently represented to the said F. A. Kage that plaintiff had agreed that judgment in said case be rendered in favor of the plaintiff and against the defendant in the sum of $250 and requested that such judgment be entered; that by reason of said fraudulent representations of the defendant, the said F. A. Kage did enter judgment in said case in favor of plaintiff for $250 and the defendant thereupon issued and delivered to plaintiff a check for $250.

"Plaintiff states that the judgment aforesaid was rendered without a trial upon the pleadings or statement before the court; that there was no evidence offered nor proofs made before the court upon the merits of the case, the extent of the plaintiff's injury or on the question as to whether such judgment was for the best interest of the plaintiff; that such proceeding was made without the knowledge or consent of J. C. Robison, father of Dewey

Robison, and against his wishes, as the defendant well knew; that said proceeding was all taken while the plaintiff was in the hospital where he had no chance to consult any one as to the best means to protect his interests and before he was fully cognizant of the extent of his injury, and that the said judgment thus rendered was produced and obtained by the defendant for the purpose of defrauding the plaintiff by barring a cause of action for damages for the injuries he received.

"Plaintiff states that the amount of said judgment is entirely inadequate to compensate the plaintiff for his injuries, and that if said judgment is allowed to stand it will bar further attempts of the plaintiff to prosecute his claim for damages for said injuries.

"Wherefore, the plaintiff brings herewith the check given him by the defendant in payment of said judgment and files the same with the clerk of this court and prays the court to declare the judgment as aforesaid void and order it to be set aside and said check returned to the defendant."

The second count is an ordinary suit for personal injuries. Its allegations are sufficiently broad to include the acts and omissions submitted to the jury for their determination as to whether they constituted negligence, viz.: the continued operation of the machine after plaintiff was directed to go from the cabin to the ground, failure to have a regular place for the ladder, failure to have a guide light for indicating the location of the ladder, failure to furnish sufficient light, and failure to instruct plaintiff as to the manner of descending from the upper part of the machine to the ground and to warn him of the danger incident thereto.

As to the first count the answer admits the rendition of the judgment by the justice of the peace and pleads the judgment in bar. With respect to the second count it is a general denial and a plea of contributory negligence.

A. trial of the issues under the count in equity was first had, resulting in a finding for plaintiff. The second count was then tried to a jury.

291 Mo.—4

Appellant seeks a reversal of the judgment on two principal grounds: first, that plaintiff wholly failed to make out a case under his pleading entitling him to have the judgment of the justice of the peace set aside; and, second, that plaintiff's evidence shows that he was guilty of contributory negligence as a matter of law.

I. It is the generally accepted doctrine that an infant cannot avoid a judgment or decree against him merely on the ground of infancy, and that he cannot impeach such a judgment or decree by an original bill, except upon grounds that would be available to an adult, such as fraud. In this case the bill alleges, among other things, that the judgment entered by the justice of the peace was caused to be so entered through and by means of fraudulent representations. As ordinarily understood, a fraudulent representation is a false statement relating to a matter of fact made with intent to deceive. The evidence wholly fails to show that any untrue statement of fact was made by defendant's agent, either in negotiating the settlement with plaintiff, or in procuring the entry of a formal judgment by the justice of the peace. And for that reason appellant insists that plaintiff failed to make a case entitling him to the relief prayed under the first count of his petition. But plaintiff does not predicate his right to such relief solely on the ground of fraudulent representation. There are other allegations of fact in the petition and they are amply supported by the proof. It is to be determined whether these constitute such fraud as warranted the court below in cancelling the so-called judgment.

There is no question but that plaintiff and defendant's agent, Mees, agreed upon a settlement whereby in consideration of the payment of $250, together with his hospital fees and doctor bills, plaintiff was to release defendant from further liability for the injuries he had sustained on account of its negligence. Such contract of settlement, even after it became executed, the plaintiff, being a minor, would have had the right to disaffirm and

repudiate at any time during his minority and within a reasonable time after coming of age. In order to cut off this right and make the contract absolute and final on the part of the plaintiff, Mees proceeded to cloak the transaction in the guise of a legal proceeding. This much the evidence clearly shows.

There can be no doubt of course but that in a suit instituted by a minor by his next friend a judgment may be rendered that will be valid and binding upon him. Such judgment, however, cannot be based merely on the consent of the minor, for he is without discretion, nor on that of the next friend, because he is not invested with either the power or the duty so to do. [Ewing v. Ferguson, 33 Gratt. (Va.) 563; Tennessee Ry. Co. v. Hayes, 97 Ala. 201; Kingsbury v. Buckner, 134 U. S. 650.] The court in such case is charged with the duty of protecting the minor's interest, and it is only when its judgment is based upon facts judicially ascertained, upon a real and not a perfunctory hearing, that its judgment is binding upon him. [Missouri Pac. Ry. Co. v. Lasca, 72 Kan. 311; Ferrell v. Broadway, 126 N. C. 258, 261; Tripp v. Gifford, 155 Mass. 108.] The judgment under consideration had no such basis. The proceeding, if it may be so called, was colorable merely from beginning to end; it did not possess a single element of a judicial hearing and determination. Its entire record was the handiwork of Mees; he prepared all of the papers and the next friend and the justice did nothing but complaisantly sign their names "on the dotted lines" pointed out by him. It should be said, however, that the two gentlemen who so obligingly signed the papers for Mees were given to understand, and they considered, that their acts in the matter were purely formal. And so they were. The "friendly suit" was not a suit in fact; it was merely a screen contrived to conceal the real transaction, the contract of settlement and release between plaintiff and defendant, and having for its purpose the foreclosure of plaintiff's right to disaffirm and repudiate his folly, upon reaching the age of discretion, or upon the receipt of mature counsel. It is considered fraudulent to take ad-

vantage of the incompetency of an infant to protect his own interest (Ralston v. Lohee, 8 Iowa, 17, 25; Leslie v. Mfg. Co., 102 Kan. 159), and as the alleged proceeding before the justice of the peace was designed for no other purpose it should be so treated. On this ground the court was warranted, under the pleadings and evidence, in setting aside the pretended judgment.

II. Appellant makes the further contention that plaintiff was not entitled to recover under the first count of his petition, because it was neither alleged nor shown that before instituting the suit he had offered to restore to defendant what he had received under the settlement. Plaintiff brought the check, the only thing that he had received from defendant, into court, filed it with his petition and asked the court to direct its return to the defendant. In an equitable action to rescind a compromise, where a tender back of moneys received is proper, it is sufficient for the plaintiff to offer, in his petition, to restore what he has received. After such offer the rights of the parties will be regulated and protected in the final judgment. Such is the rule in this State and the one that prevails generally. [Whelan v. Reilly, 61 Mo. 565; Paquin v. Milliken, 163 Mo. 79. 105; Carroll v. United Rys. Co., 57 Mo. App. 247, 293; 18 Ency. Plead. & Pr. 836.]

III. Appellant strenuously insists that the evidence convicts plaintiff of contributory negligence as a matter of law. The facts having a bearing on this phase of the case have been very fully set out in the preceding statement and need not be repeated here. The particulars in which it is claimed that plaintiff was negligent are: (1) in going down on the frame work of the machine instead of on the ladder provided for that purpose; and (2) in going down on the inside of the frame after he had been warned not to do so and when the outside was obviously the safer way. As to the first, plaintiff testified directly and positively that he was trying to go down on the ladder and not the frame. He says that when he stepped

Robison v. Construction Company.

out of the cabin down on to the porch it was so dark about the lower part of the machine that the ladder could not be seen. He did not say that he looked for it, but that it was so dark that there was no use to look. He had come up on the ladder and it was at the same corner. He was to a certain extent unfamiliar with his surroundings and the movements of the machine. He stepped down on the frame as the boom moved away from him and started to where he thought the ladder was. Certainly it cannot be said as a matter of law that he was negligent because he was mistaken as to the corner.

Even if the statement of the pit foreman to the plaintiff, that he, the foreman, always went down on the outside of the frame, could be construed as a warning to plaintiff not to go down on the inside, the warning was not wilfully disregarded. Plaintiff was not attempting in the first instance to go down on the frame, either on the inside, or the outside. He was hunting the ladder. He suddenly became aware that he was in a position of peril. It now seems true, as appellant contends, that plaintiff could, in all probability, while holding to the upper plate of the frame work, have let himself down on the outside and then dropped two or three feet to the ground without injury. But plaintiff was not in a condition to reason calmly about his situation. He was controlled by the instinct of preservation and not by the dictates of care and reason. He pictured himself coming into contact with highly charged electric wires with broken insulation, if he dropped down on the outside; to him that was not an obviously safe way. On the other hand he had once before gone down between the prongs of one of the I-beams safely and easily and he thought that he had the time to do so again. It seems clear that whether in so doing he failed to exercise that degree of care that an ordinarily prudent man of his experience would have exercised under the same circumstances was a question for the jury.

Appellant's counsel earnestly insist that the cases of Boesel v. Wells Fargo Co., 260 Mo. 463, and Henry

v. Railroad, 141 Mo. App. 351, are controlling on the facts of this with respect to the question of contributory negligence. But those cases are wholly unlike the one at bar on the facts, unless one isolated bit of evidence in the latter, inconsistent with the other evidence in the case, be held to portray the real facts. One of defendant's witnesses testified that plaintiff stated that he believed the pulley on the lower end of the boom would clear his leg—pass over it—and that he would, therefore, be safe with one leg over the I-beam, and plaintiff did not, in rebuttal, expressly deny having made the statement. But the substance of the statement was in effect contradicted by all of plaintiff's testimony touching that phase of the case and it was for the jury to say, from all the evidence what the true facts were.

We concur in the trial court's finding under the first count, and as no reversible error in connection with the trial to the jury under the second count has been pointed out, the judgment should be affirmed.

It is so ordered. *Small, C.,* concurs; *Brown, C.,* absent.

PER CURIAM:—The foregoing opinion of RAGLAND, C., is adopted as the opinion of the court. All of the judges concur.