FANNIE HOCKENBERRY, Executrix of the Last Will and Testament of A. T. HOCKENBERRY, v. COOPER COUNTY STATE BANK of Bunceton, a Corporation, and COOPER COUNTY BANK of Bunceton, a Corporation, and O. H. MOBERLY, as Commissioner of Finance in Possession of Assets and in Charge of The Cooper County State Bank of Bunceton, a Corporation, Appellants.—88 S. W. (2d) 1031.

Division One, December 18, 1935.

32

*Roy D. Williams, W. W. Carpenter, Jr.,* and *L. O. Schaumburg* for appellants.

34

*Dorsey W. Shackelford* and *Clark, Boggs; Peterson & Becker* for respondent.

HYDE, C.—This is a suit in equity to set aside a judgment of the Probate Court of Cooper County, in favor of the two defendant banks for $82,316.81, upon a demand against the estate of A. T. Hockenberry, deceased, upon the ground that said judgment was procured by fraud. The trial court found for plaintiff and entered a decree setting the judgment aside. The defendant banks, now in possession of the State Commissioner of Finance for liquidation, have appealed from this decree.

Since this case is in equity, it is considered *de novo* on appeal in this court, but we usually defer to the findings of the chancellor who has heard conflicting oral testimony and passed upon the credibility of witnesses in reaching his conclusions. [Barlow v. Scott (Mo.), 85 S. W. (2d) 504, and cases cited.] In order to determine whether the chancellor's findings were warranted, we will state the admitted facts and the evidence which, if true, would support them. The judgment sought to be set aside was, as follows:

"Now on this day the administratrix of said estate having duly waived in writing for allowance the claim of the Cooper County State Bank and the Cooper County Bank duly verified by their af-

fidavit *being a note* for $82,316.81, the Court having heard the evidence does allow said demand against the estate for the sum of $82,316.81, and it is hereby assigned to the 6th class with interest at six per cent."

Mr. A. T. Hockenberry, plaintiff's deceased husband, was a member of the board of directors of the Bank of Bunceton in April, 1928. By a resolution of this board on April 17, 1928, the officers of this bank were authorized to execute a contract for the sale of its assets and the assumption of its liabilities (except capital liabilities) by the Cooper County Bank, also located in Bunceton. The minutes of the meeting of April 17th, at which this resolution was passed, recited "that the volume of business does not warrant our continuing in business and the future outlook does not appear to be such that the same can be profitably increased to sufficient volume to enable the bank to have enough earnings to take care of the expense and losses likely to occur." The directors also signed an instrument entitled "Agreement Guaranteeing Assets," dated April 17, 1928, which recited that "as an inducement and as part of the consideration for the execution by the Cooper County Bank of the contract to purchase the assets of said Bank of Bunceton, *executed concurrently herewith*, we the undersigned, jointly and severally do hereby agree and promise to pay on demand to the Cooper County Bank of Bunceton, Missouri, a sufficient amount to equal the difference between the assets assigned to the said Cooper County Bank, and the liabilities assumed by it, providing such assets are not liquidated in sufficient amount to meet such liabilities on or before the 25th day of April, 1931." However, no contract was, in fact, entered into between the two banks on April 17, 1928.

On April 19, 1928, the board of directors of the Cooper County Bank met, as shown by their minutes, "for the purpose of discussing the advisability of selling the assets of the Cooper County Bank, to the Cooper County State Bank, a banking corporation now being organized for the purpose of purchasing the assets of the Bank of Bunceton and those of the Cooper County Bank and the assumption of the liabilities of each bank, except capital stock liabilities." They adopted a resolution at this meeting, authorizing their officers "to execute a contract with the Cooper County State Bank, for the sale and transfer of all of the assets of the Cooper County Bank, and the assumption of all of the liabilities of the Cooper County Bank, except the capital stock liability, by the Cooper County State Bank." The minutes of the meeting recited that this action was deemed a public advantage and necessity by the board of directors and Commissioner of Finance after "a thorough canvass of the assets as set out as frozen or doubtful during the examination made on the 12th day of April." Apparently the Cooper County State Bank

was organized within the next few days by the directors of the ·Cooper County Bank, since it began to function on the 25th day ·of April, 1928, with identically the same directors and officers as those of the Cooper County Bank. For convenience, we will hereinafter refer to the Cooper ·County Bank as the County Bank and to the Cooper County State Bank as the State Bank and to the Bank of Bunceton as the Bunceton Bank.

On April 25, 1928, the directors of the County Bank met and adopted a resolution authorizing its officers to buy the assets and assume the liabilities of the Bunceton Bank and such a contract was entered into between the officers of the two banks on that date. This contract provided "that sufficient of the assets purchased, to equal in amount the deposits and other liabilities assumed shall be carried as primary assets, and all remaining assets shall be carried as secondary assets, the secondary assets to be held as collateral to the primary assets." This contract provided for a final settlement between the two banks in three years. The directors' agreement dated April 17, 1928, was apparently delivered with this contract, although it is not mentioned in it, and although it did not contain the words "successors or assigns." A supplemental agreement, signed by the directors of the Bunceton Bank dated April 25, 1928, recited that it was "in addition to the guarantee of April 17, 1928, and a further inducement for a contract;" and that these directors guaranteed to the County Bank *"or its successors or assigns"* an income of not less than six per cent per annum on the primary assets taken ·over by it and agreed to pay to the County Bank *"or its successors or assigns"* every ninety days upon demand "any deficiency arising by reason of it having received on such primary assets less than six per cent." Also on April 25, 1928, the directors of the State Bank, who were the same persons as the directors of the County Bank, authorized its officers to purchase the assets of the County Bank and assume its liabilities and on that date such a contract was signed by the officers of the County Bank and the officers of the State Bank, who were the same persons. No personal guarantee of assets of the County Bank was made by its directors, and the final settlement between these two banks was to be made in two years. Under these contracts, and by additional conveyances in the case of real estate, the assets of the Bunceton Bank were transferred to the County Bank, and it transferred them, together with its own assets, to the new State Bank. The charters of the two old banks were kept alive but they ceased banking business.

Mr. Hockenberry died May 16, 1930. Since he died prior to the termination of the three-year period provided for liquidation of the primary assets of the Bunceton Bank, the directors had not been called upon to pay anything under the guarantee of April 17, 1928.

However, they had been required to pay certain amounts under the supplemental guarantee of April 25, 1928, because the primary assets of the Bunceton Bank had failed to earn six per cent interest throughout all of that time. One of the directors of the Bunceton Bank, Arthur Blomquist, had been its cashier, and became cashier of the new State Bank. Respondent was named executrix of her husband's will. At the time of her husband's death she had been an invalid for fifteen years, unable to walk, and was described as "a helpless cripple, not able to do anything for herself." She said that she had never had any business experience, but agreed to act as executrix because her husband insisted. She said: "Mr. Hockenberry told me when he passed away that Mr. Blomquist would help me with the business. . ' . . I relied upon him as being my helper. . . . He promised Mr. Hockenberry, before he passed on, that he would help do that."

Mr. Blomquist said, about this: "Mr. Hockenberry on his death bed asked me to assist Mrs. Hockenberry to look after her business. He didn't want to be put to a lot of expense, and I told him he had been so nice to me I would do anything I could do for her, in any way I could. . . . (in her presence) . . . I suggested to her a number of times that she employ an attorney to look after her business, and she said she didn't need an attorney; that Mr. Hockenberry had confidence in me, and she did too. . . . I assisted her in any way I could. But I never got a penny for it. . . . She offered to (pay), but I would not take it." Respondent's evidence was that Mr. Blomquist told her "that it was not necessary for her to have an attorney." Respondent did qualify as executrix of the estate, which consisted almost entirely of land. Mr. Blomquist was a witness to Mr. Hockenberry's will and said that he wrote it. He also said that he attended to having the will probated; that he acted as one of the appraisers of the estate; and that he prepared her settlements and took her acknowledgments on them. Respondent, in fact, never did go to the probate court.

Early in 1931, the remaining directors of the Bunceton Bank began to negotiate with the State Bank for a postponement of the time for settlement, which was set for April 25, 1931. After conferences with the Commissioner of Finance, a contract was entered into by them with both the County Bank and the State Bank, extending time of settlement to the 25th day of April, 1932. This contract recited that Mr. Hockenberry had died; that "on the 25th day of April, 1931, there remained due to the Cooper County Bank and its successors and assigns, so far as then ascertained, the sum of $82,316.81, Dollars in cash, under and by virtue of the aforesaid agreements, although all of the assets of the Bank of Bunceton taken over by the Cooper County Bank under the contract aforesaid have not been

converted into cash;" and that "the only means deemed available for the purpose of holding said estate liable under the aforesaid contract is for the said Cooper County Bank and its successors and assigns to prove up and establish against the estate of said A. T. Hockenberry, deceased, the amount of the aforesaid claim, debt or obligation in the sum of $82,316.81, Dollars." By this contract, the remaining directors agreed that these banks should "undertake to have established against the estate of A. T. Hockenberry, deceased, a claim or demand in the sum of Eighty-Two Thousand Three Hundred Sixteen and 81-100 Dollars;" and that "by the establishment, or attempted establishment of the aforesaid claim or demand, or any part thereof, against said estate of A. T. Hockenberry, deceased, neither the Parties of the First Part, or either of them, shall be relieved of any liability assumed by them, . . . if such claim or demand against said estate of A. T. Hockenberry, deceased, for any reason whatsoever, shall be reduced in amount, or disallowed as a whole."

In addition to this contract, other contracts were entered into on the same date between the County Bank and the State Bank, between the Bunceton Bank and the other two banks, and between the directors of both old banks and the new State Bank, renewing all original agreements for another year, and all of these contracts were authorized by resolutions passed by the boards of each bank. Mr. Blomquist signed these contracts both individually and as an officer of the Bunceton Bank. As provided in these contracts and resolutions, a claim was prepared against the Hockenberry estate for $82,-316.81. This amount was arrived at by adding together the liabilities of the Bunceton Bank (mostly for its deposits) which had been assumed by the County Bank on April 25, 1928, and by then deducting from this total amount of liabilities the cash and exchange taken over from the Bunceton Bank on that date, the amount allowed for its building and fixtures, and also all amounts collected prior to April 25, 1931, from its primary assets. This claim recited that the State Bank had purchased the assets of the County Bank on April 25, 1928, "and acquired an interest in contract" between it and the Bunceton Bank and its directors. There was attached to this claim all of the contracts and resolutions of April 27, 1931, as well as inventories of the deposit liabilities of the Bunceton Bank, the primary assets taken over from it held by the other banks and collections therefrom, and all of the original contracts of April 25, 1928. These cover about 150 pages of the printed abstract of the record, and made the claim a very voluminous document.

Mr. Blomquist said that he went, at the request of the other directors, to see respondent at her home to get her to consent to the allowance of this claim. He said that he asked some of the other

directors to go but they said "I had been going and I could get it done." He said that he had previously informed her about negotiations for the renewal. The claim had been prepared by Mr. Schaumburg, who was attorney for the banks, and he brought these papers to Bunceton. Mr. Schaumburg said: "I intended to serve the notice on her by the sheriff and Mr. Blomquist said she was an invalid and it would probably frighten her and to go and get her signature." Mr. Schaumburg was not acquainted with respondent and had never met her. Mr. Blomquist and Mr. Schaumburg did go out to respondent's home and respondent signed a waiver on the back of the claim, which read as follows:

"I, Fannie Hockenberry, as Executrix of the Last Will and Testament of A. T. Hockenberry, deceased, hereby waive service upon me of a copy of the attached demand before presentment of the same for allowance against said estate of A. T. Hockenberry, deceased; and I hereby consent and agree that said demand or claim is justly due and owing claimants, and that the same may be presented for allowance and allowed against said estate at any term of the Probate Court of Cooper County, Missouri."

There is conflict in the testimony as to whether or not Mr. Schaumburg was present when respondent signed this waiver. She said that he was not present and she had signed it before he came there, but said that he did come with Mr. Blomquist and read to her from some papers. Both Mr. Schaumburg and Mr. Blomquist said that she signed the waiver while they were there, although both agreed that Mr. Blomquist went in first and that Mr. Schaumburg waited for a while in the yard before he went in. Mr. Schaumburg said: "I couldn't give a single statement I made use of at that time. . . . I could not say whether I read the demand to her or the contracts."

Plaintiff testified to what she said Mr. Blomquist told her when she signed the waiver, which she said was when Schaumburg was not present, as follows: "He told me they was trying to get that time extended on that bank claim and he told me they wanted me to sign those papers so they could get that time extended and, of course, I just signed them. . . . . I didn't know at the time I was signing a judgment for all of that. . . . He said it would not put me in any deeper than I already was. . . . That we would all be liable and not have the whole thing on me." She said positively that he did not tell her that he was presenting a claim against the estate for $82,316.81; or that she was signing a consent to a judgment against the estate; and that she did not learn that there was a judgment against the estate until a short time before this suit was filed. She further stated that when Mr. Blomquist first mentioned an extension, she told him that she "didn't see anything to be gained by it" and "didn't see that it would benefit us any;" but that "they called a meeting of the board of directors and he

came back and said that they all wanted it extended and . . . wanted me to sign those papers to get it extended."

Mr. Blomquist testified concerning what he said to respondent, as follows:

"There was no discussion, except as there had been, as I told her before, before extending this contract which she wanted extended, that it would be necessary for the whole amount then due, would. have to be probated against Mr. Hockenberry's estate, but it wasn't the intention of any of the directors to shoulder the liability on her; that they would assume their part, whatever it would be. . . . We had no idea what it would amount to, at the time of the final. settlement. . . . I said this is the agreement I mentioned to her that had to be filed against Mr. Hockenberry's estate in order to get the contract extended with the Cooper County State Bank. That unless this was done he would be relieved after we made the extension, and it had to be probated in the whole in order to protect the other directors so that he would be held liable on the guarantee and they did not want to go ahead and extend unless he did. . . . I don't think I gave her any amount. . . . I told her in order to get the extension of his estate it would have to be filed against his estate in order to keep from relieving the estate under the contract, before we extended it. . . . I talked it over with her a number of times and told her before we could extend the contract for another year it would be necessary that the claim be proved up in its entirety and she knew the board of directors as well as I did and they would not saddle anything on her, they would do their part, but in order not to relieve Mr. Hockenberry of his obligation it was necessary that this be proven up in full."

It further appears from the testimony of Mr. Blomquist that he did not inform respondent of any definite amount that the estate would probably have to pay; that he did not tell her that some of the directors were not able to pay their part; that he "didn't know how many would be able to pay;" but that he did know that some of them could not do so. This claim was filed in probate court on May 1, 1931, which was evidently the next day after the waiver had been signed by respondent. It was allowed twelve days later on the second day of the May Term. At that time, some of the primary assets taken over from the Bunceton Bank were notes which were secured by first mortgages on real estate, and there were other notes of some value. There was also some real estate in the secondary assets, held as collateral, and it was shown that in January, 1932, the directors of the State Bank were willing to take $65,000 in full settlement of the Bunceton Bank contract.

Appellants' claims are that plaintiff failed to show that there was any fraud in the procurement of this judgment, or that she had

a valid defense to the cause of action upon which the judgment was obtained; and that the court admitted incompetent evidence. A judgment cannot be set aside on the ground of fraud unless it is shown that fraud was practiced in the very act of obtaining the judgment; that the fraud went to manner in which the judgment was procured rather than operating upon matters pertaining to the judgment itself; that the fraud prevented the unsuccessful party from presenting his case or defense; or that the fraud otherwise went to extrinsic, collateral acts or matters not before the court for examination or determination in the suit or proceeding in which the judgment was rendered. [Phillips v. Air Reduction Sales Co., 337 Mo. 587, 85 S. W. (2d) 551; Fadler v. Gabbert, 333 Mo. 851, 63 S. W. (2d) 121; Gilliland v. Bondurant, 332 Mo. 881, 59 S. W. (2d) 679; Elliott v. McCormick, 323 Mo. 263, 19 S. W. (2d) 654; Peeters v. Schultz, 300 Mo. 324, 254 S. W. 182; Robison v. Floesch Construction Co., 291 Mo. 34, 236 S. W. 332; Marley v. Norman's Land & Mfg. Co., 289 Mo. 221, 232 S. W. 704; Lieber v. Lieber, 239 Mo. 1, 143 S. W. 458; Cantwell v. Johnson, 236 Mo. 575, 139 S. W. 365; United States v. Throckmorton, 98 U. S. 61, 25 L. Ed. 93; 15 R. C. L. 760-771, secs. 214-223; 34 C. J. 470-478, secs. 738-746; notes, 88 A. L. R. 1201; 49 A. L. R. 1219; 16 A. L. R. 397; Bolden v. Sloss-Sheffield Steel & Iron Co., 215 Ala. 334, 110 So. 574, 49 A. L. R. 1206; Chicago, Rock Island & Pacific Railroad Co. v. Callicotte (C. C. A.), 267 Fed. 799, 16 A. L. R. 386.] Such a proceeding cannot be used to obtain a further hearing upon matters, which were or could have been brought before the court to make a case or defense, either because the parties found further evidence bearing upon the truth or falsity of the testimony there, or because the parties neglected to litigate such matters in the original case. "Courts of equity do not grant such relief for the purpose of giving the defeated party a second opportunity to be heard on the merits of case." [Rogers v. Dent, 292 Mo. 576, 239 S. W. 1074; 1076, 26 A. L. R. 615. See, also, Wabash Ry. Co. v. Mirrielees, 182 Mo. 126, 81 S. W. 437; Hamilton v. McLean, 139 Mo. 678, 41 S. W. 224.]

Applying such principles to this case, it appears that respondent did rely solely upon fraud as to extrinsic and collateral acts, not going to matters which could have been urged as a defense to appellants' claim, but which operated to prevent her from making any defense at all. It seems clear that the evidence was sufficient to warrant a finding by the chancellor that there was such fraud and that it was practiced in every act of obtaining the judgment and entered into its procurement. Mr. Blomquist had a very vital interest both individually and as an officer of the State Bank in having a judgment rendered against the Hockenberry estate. It would tend to relieve him of individual liability and also to insure the con-

tinuance, as a going concern, of the bank which employed him. None of the interested parties can be blamed for taking legal steps to hold the Hockenberry estate, but these directors were attempting to make a better deal for themselves than for respondent. Mr. Blomquist certainly, was the one member of the board of directors of the Bunceton Bank who should not have undertaken "to get it done" by persuading respondent to consent to a judgment against the estate, without the benefit of disinterested advice, because he was acting, so far as this record shows, not only as her confidential advisor in the affairs of this estate but as the only business advisor she had. Under such circumstances, it was his duty to make full disclosure of everything he knew about the matter which could have in any way influenced her decision. It is always fraudulent for one, in a position of confidential relationship with another to persuade such person, trusting in his counsel, to make a transaction, beneficial to him but against the interest of the person relying upon his advice, without fully disclosing all material facts. [Patton v. Shelton, 328 Mo. 631, 40 S. W. (2d) 706; Manahan v. Manahan (Mo.), 52 S. W. (2d) 825; Klaber v. Unity School of Christianity, 330 Mo. 854, 51 S. W. (2d) 30; Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772; 15 R. C. L. 766, sec. 218; 12 R. C. L. 311, sec. 72; 5 A. L. R. 672, note; 26 C. J. 1076, sec. 18; Laun v. Kipp (Wis.), 145 N. W. 183, 5 A. L. R. 655.]

That was exactly the situation here. Mr. Blomquist and the other directors were acting to obtain for appellants a final judgment against the Hockenberry estate on the guaranty for the greatest amount that could possibly have been claimed even if every dollar of the remaining primary assets taken over from the Bunceton Bank had been wholly worthless. At the same time they were left free to contest liability either as to amount or as to whether they were bound at all. It was certainly against the interest of the Hockenberry estate to have liability finally settled against it alone, by a final judgment in such an amount. We take judicial notice of our own records which show that all of the remaining directors did contest liability; that they were successful in obtaining a judgment completely discharging them; and that they seek an affirmance of such result on an appeal therefrom now pending here. At least, they were not undertaking to bind themselves to the same extent as they were seeking to bind the Hockenberry estate and, on appellants' own showing, Mr. Blomquist's statements would seem likely to leave respondent with the impression that they would all remain equally bound. Surely, no reasonably prudent disinterested counselor knowing all of the facts would have advised respondent to consent that a judgment in such an amount be entered against the estate fixing its liability for all time and leaving it at the mercy of appellants to voluntarily

reduce it. It should not take much argument to convince any court that she did not comprehend either the contents or the effect of all of the voluminous documents attached to the claim which was presented to her to sign. Evidently the probate court did not fully understand them because its judgment states that the claim is based "on a note for $82,316.81." Nor would the evidence seem to leave much reason to doubt that respondent had no idea that she was consenting to a judgment, for the full amount of $82,316.81, which would be a final determination of the liability of the estate, from which there could be no appeal after ten days from the end of the term at which it was rendered; which the estate could be made to pay in full if the other directors did not voluntarily pay; for which the liability of none of the others would be likewise judicially determined; and which if she "sold everything on earth" she had she "couldn't near pay." Mr. Blomquist seems to have used the terms "filed" and "probated" rather than "judgment." It also appears that Mr. Schaumburg intended to make this a real adversary proceeding by having notice thereof served on respondent by the sheriff (which fact respondent never learned), but that Mr. Blomquist asked him not to do so because "it would probably frighten her." A Cooper County sheriff may present a formidable appearance, but it would seem reasonable to believe that the prospect of a judgment for such an amount as $82,316.81 would be even more likely to frighten most people. We hold that the evidence was ample to sustain a finding by the chancellor that the judgment was procured by fraud, which prevented respondent from learning the true nature of the proceeding and from making a defense thereto.

Of course, as appellants contend, to be entitled to the relief asked for, respondent must show that she has a valid meritorious defense to the claim upon which appellants obtained judgment. "It is not necessary to show conclusively that complainant has a sufficient . . . defense, but it suffices to establish good faith and tender a seriously litigable issue" as a "meritorious defense to the claim or any part of it." [Crow v. Crow-Humphrey, 335 Mo. 636, 73 S. W. (2d) 807, and authorities cited; Greenard v. Isaacson (Mo. App.), 220 S. W. 694; Sauer v. Kansas, 69 Mo. 46; 34 C. J. 489, sec. 768; see also secs. 695-697; 15 R. C. L. 735-738, secs. 189-192; 39 A. L. R. 415, note.] Here, appellants were not shown to be entitled to a judgment for the full amount of $82,316.81, because it was shown that this was merely the total amount of all remaining primary assets; that there were valuable notes among these primary assets; and that no final settlement between the banks was made to determine the actual amount required to comply with the contract. No doubt, this claim would have been reduced if it had been contested, because the loss could not have been that much. It would at least be a reason-

able contention that this guaranty was not an agreement to repurchase uncollected assets on a certain date, since it required the directors only to pay ''a sufficient amount to equal the difference between the assets assigned,'' and ''the liabilities assumed;'' and that if this was intended to mean anything more than difference between the value of the primary assets remaining in the new bank on the contract date of settlement and liabilities assumed for which it had not yet been compensated, it could have plainly said so. Anyhow, it was manifestly unfair to construe and enforce this agreement one way against respondent and another way as to the other directors, and that was certainly the effect of entering judgment against the estate for the full amount of these assets while leaving the liability of the others to be determined on a different basis. Furthermore, under the facts shown here there was at least a serious question, which respondent was entitled to have litigated, as to whether or not Mr. Hockenberry ever became bound to the new State Bank upon the contract of April 17, 1928. A court of equity could clearly see that these matters were not fully disclosed to respondent; that she was, by her reliance upon Mr. Blomquist, prevented from seeking advice which would have revealed these proper defenses to her; that she might, at least, have prevented a judgment against the estate for the full amount of this claim; and that there never was, in fact, a real lawsuit tried and determined on the merits between appellants and the Hockenberry estate. ''So seeing, equity will declare it nothing and allow a real suit to proceed.'' [Gilliland v. Bondurant, 332 Mo. 881, 59 S. W. (2d), l. c. 682.]

We further hold that there was no error in admitting in evidence Exhibit M, an examiner's report of his examination of the State Bank on April 8, 1930, and Exhibit P, a report of the examination of the State Bank by a committee of its stockholders on April 3, 1929. These reports tended to show some of the facts upon which respondent could have based a meritorious defense to appellants' claim. Moreover, anything contained therein, which might not be competent, will be considered as having been disregarded by the chancellor since there is nothing to show that his finding was based thereon and, therefore, this could not be a ground for reversal. [Lowe v Montgomery, 321 Mo. 330, 11 S. W. (2d) 41; Snow v. Funck (Mo.), 41 S. W. (2d) 2; Blackiston v. Russell, 328 Mo. 1164, 44 S. W. (2d) 22.]

The decree is affirmed. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.