## HURLEY v. SOUTHERN CALIFORNIA EDISON CO., Limited.

### No. 12278.

United States Court of Appeals
Ninth Circuit.

May 25, 1950.

Rehearing Denied Aug. 9, 1950.

Thurman L. McCormick, Kansas City, Mo., and Harold Easton, Los Angeles, Cal., for appellant.

Chas. E. R. Fulcher, Carol G. Wynn, Fulcher & Wynn, Los Angeles, Cal., for appellee.

Before STEPHENS, ORR and POPE, Circuit Judges.

POPE, Circuit Judge.

This was an action brought by the appellant, Lester W. Hurley, against the appellee, Southern California Edison Company, Limited, here called the Company, to require it to account for dividends on its stock, and certain stock rights, which Hurley asserts the Company paid out and delivered to the wrong person.

On November 20, 1928, Hurley was a minor of the age of 20 years. He resided, and still resides, in the State of Missouri. His mother had died previous to that date. Elizabeth J. Price, wife of William Price, and then a resident of California, was his grandmother. Hurley's mother, and his uncle, George E. Burton, were children of Elizabeth J. Price by a former marriage.

On the date mentioned William Price, theretofore the owner of the shares of stock here described, caused the appellee Southern California Edison Company to issue in the name of Elizabeth J. Price, George E. Burton, and the appellant, Lester Hurley, as joint tenants with full right of survivorship, certificates evidencing ownership of shares of the common and of the preferred stock of the Company. The certificates so issued were delivered to the grandmother, Elizabeth J. Price. Hurley knew nothing of these certificates, or that he was listed as a part owner of these shares until after his grandmother's death, some 15 years later.

Prior to the issuance of these certificates, Elizabeth J. Price requested Hurley to sign two dividend orders in blank on forms provided by the Company. Hurley had no knowledge of their purpose, and signed them gratuitously. They were delivered to the Company on December 11, 1928, and as delivered bore the signatures of the three joint owners, Elizabeth J. Price, George E. Burton, and Hurley. They requested payment of all dividends to Elizabeth J. Price.[1] One was dated November 19, 1928 and listed 575 shares of common stock. The other was dated November 22, 1928, and listed 88 shares of common and 191 shares of series B preferred stock.

Less than a month later William Price died. Two weeks later, and on January 19, 1929, Elizabeth J. Price caused a bank at Kansas City, Kansas, where she was following her attendance at her husband's burial in Missouri, to forward the certificates for the 575 shares of common stock to the Company with assignments attached purporting to be signed by the three joint owners, including Hurley, and purporting to assign the 575 shares to "Mrs. Elizabeth J. Price or George E. Burton". The Company returned the papers to the bank with the request that the signatures be guaranteed. They were again forwarded to the Company with the bank's guarantee of the signatures of Mrs. Price and Burton. The Company sent them back again with suggestion that the transferee designation be changed to joint tenancy form and that Hurley's signature be guaranteed. The bank then altered the designation to read: "Elizabeth J. Price and George E. Burton, as joint tenants, with full rights of survivorship", and added its guarantee of the signature of Hurley. Upon receipt of the altered assignment the Company transferred on its books the 575 shares to Mrs. Price and Burton as joint tenants.

Elizabeth J. Price died on December 27, 1943. It was after her death that Hurley first learned about the stock. He demanded of the Company one-third of the stock and one-third of all dividends and stock rights. Burton then brought in the United States

1. Each order was addressed to Southern California Edison Company, and read as follows: "Until this order is revoked in writing, please remit to Mrs. Elizabeth J. Price at the address given below, by check drawn to his order, the dividend now due, or which may become due on all shares of stock of your company, now or hereafter standing in the names of Mrs. Elizabeth J. Price and George E. Burton and Lester Hurley on the books of your company."

District Court for the District of Kansas an action to determine the ownership of the 575 shares. Hurley filed a cross-petition upon which he was adjudged owner of an undivided half interest in the 575 shares. An attempt by Burton to make the Company a defendant also did not succeed, and it was not a party. That court determined both that Hurley was a minor at the time of the purported assignments and that his signatures on the assignments had been forged.

The lower court held that the judgment of the district court for the district of Kansas was res judicata here and conclusive of the fact that the signature to these assignments had been forged. The court below also found that Hurley remained ignorant of his ownership of any interest in the stock of the Company until March 18, 1944, when he first learned of what his grandmother had been doing with the stock. It was then that he promptly disaffirmed the dividend orders, and the purported transfers.

But in the period from November 20, 1928, when the stock was first issued in the names of the three joint tenants, until the date of Mrs. Price's death, all dividends paid upon the stock, and also all stock rights declared and set aside to the owners of the stock, had been paid and delivered to Mrs. Price. After the purported assignment of the 575 shares to Mrs. Price and Burton (upon which the court held Hurley's signature was forged), Burton had executed a dividend order directing payment of dividends to Mrs. Price. The aggregate value of the dividends and stock rights received by Mrs. Price on the 575 shares was $20,-458.50, and on the other stock, common and preferred, $3,175.04. In this action Hurley has sued the appellee Company to recover one-third of these amounts, which he asserts was wrongfully and unlawfully paid or delivered to Elizabeth J. Price.

The facts thus summarized were set forth at length in the district court's findings. The court found that the Company had no actual knowledge of the fraud perpetrated on Hurley by his grandmother and that it "had no reason to believe that any fraud was being, or had been, so perpetrated". The court concluded that on these facts Hurley would be entitled to recover "if Section 1475 of the California Civil Code were not applicable in this case", but that "pursuant to the provisions of Section 1475[2] . . . defendant discharged its obligations to the plaintiff as an owner in joint tenancy of stock in the defendant corporation by its payment of dividends to and delivery of stock rights to, or upon the order of, Elizabeth J. Price, joint tenant and joint obligee".

In support of the court's conclusion the Company points out that if we assume, as the court held, that at all the times when dividend payments were made, and stock rights delivered, Hurley was one of three joint owners of the stock, the payments made to Elizabeth J. Price, one of the joint owners were within the exact terms of the statute,—it was a "performance rendered to [one] of them," and the obligation to pay dividends or assign stock rights was thereby extinguished.

Hurley says that the statute has no such application; that as enacted it is subject to the qualifications and exceptions which were recognized in such cases by the common law, of which the statute was intended to be declaratory,[3] and that the facts here are such that under the common law rule, and the rule applied by the California courts, the statute on which the court relied is not applicable. It is pointed out that in the case of Cober v. Connolly, 20 Cal.2d 741, 128 P.2d 519, 521, 142 A.L.R. 367, in applying this section, the Supreme Court of California recognized that there were exceptions to be read into the statute, for the court there stated the rule in the language of sections 130 and 131 of the Restatement of the Law of Contracts, as follows: "Section 130 of the Restatement of the Law of Contracts provides: 'Except as the rules

2. "Sec. 1475. Performance to one of joint creditors. An obligation in favor of several persons is extinguished by performance rendered to any of them, except in the case of a deposit made by owners in common, or in joint owner-ship, which is regulated by the title on deposit."

3. Cf. In re Estate of Elizalde, 182 Cal. 427, 188 P. 560, and California Civil Code, Sec. 5.

of this Section are qualified by section 131 * * * a discharge by a joint obligee of his individual right operates as a discharge of the joint right of all.' Section 131 reads: "* * * A discharge of the promisor by an obligee in fraud of a co-obligee is inoperative to discharge the promisor's duty to the extent of the co-obligee's interest in the performance, if the promisor gives no value or knows, or has reason to know of the fraud.'"

The California court also referred to Williston's statement of the same rule which is expressed in the statute.[4] Williston states the exception as follows: "But even though a release of a joint right by one obligee is made in the exercise of a clear legal power, it would seem that if the release were intended and known to be intended as a fraud on the rights of other obligees, the obligor could not be allowed to set up his legal defense as a bar to an action by the defrauded obligee."

It seems clear from what was said of the statutes in Cober v. Connolly, supra, that the statute would not be held to furnish a defense in every case where the obligor rendered performance to one of several joint owners of an obligation. When the receipt of performance by the one joint owner alone is intended to be, and known by the obligor to constitute "a fraud on the rights of other obligees", the obligor is not discharged under the code rule. As stated in section 131(2) of the Restatement, this is the result if the promisor "has reason to know of the fraud".

There is authority to support the view that "fraud", as here expressed, may consist merely of the intended retention of the benefits of performance by the one joint obligee, and exclusion of the others therefrom. Thus, the Restatement supplies the following illustration of the rule stated in section 131: "A, B and C are severally, jointly, or jointly and severally entitled to have D pay them $1000. The money when received by them is by their arrangement with one another, to be shared equally. D knows of this arrangement. A gives D either a release which purports to discharge A's individual right, or a release which purports to discharge the rights of A, B and C. The consideration in either case is a discharge by D of a claim which is due him from A individually. The release operates as a satisfaction of only the one-third interest of A in the performance due from D."

This suggests that the obligor may know, or have reason to know of such "fraud" if he is advised that the obligee receiving a payment due several joint obligees intends to keep the entire amount for himself and not to account to the others. A number of authorities applying the common law rule have so held. Weir Plow Co. v. Evans, Tex.Civ.App., 24 S.W. 38; Lemiette v. Starr, 66 Mich. 539, 33 N.W. 832; Remington v. Eastern Ry. Co., 109 Wis. 154, 84 N.W. 898, 85 N.W. 321; Rooks v. Stanaland, 33 Ga.App. 8, 124 S.E. 904.[5]

Upon first examination the case of Cober v. Connolly, supra, might be thought to be an authority contra, for in that case Cober, owing $850 to Eversole, Held and Connolly, arranged with Eversole to furnish to him job printing, hotel cards, the publication of legal notices, and newspaper subscriptions, as ordered by Eversole, in payment of Cober's obligation. Printing and advertising to an amount of $1255 were thus furnished to Eversole, $290 of which were delivered to him, and the rest to other persons. Connolly had no notice of any of this. Eversole did not account to him, and became insolvent. In holding the debt to all three, including Connolly, discharged by reason of Section 1475, the court said, after referring to Section 131 of the Restatement: "The appellants do not claim that the Cobers did not give value, *or that they had any knowledge concerning Eversole's failure to account to the other payees of the note.*" (Emphasis supplied.) It is thus suggested that Cober

---

4. 2 Williston on Contracts (Rev.Ed.1938) Sec. 343, p. 1014.

5. These cases are collected in a note to Cober v. Connolly, supra, in 142 A.L.R. page 371. See part V, 142 A.L.R. at page 380.

had the right to assume that Eversole would account to Held and Connolly, out of his collections from the persons receiving the printing, or otherwise.[6]

In this case, it is pointed out, the Company must have known that Mrs. Price did not intend to account to Hurley, at least for the dividends and stock rights received on account of the 575 shares, for these she claimed to own, jointly with Burton alone, and exclusive of Hurley.

Appellant argues that the knowledge and notice chargeable to the Company goes much farther than this. He says that the Company had actual or implied notice, not merely that Mrs. Price intended to keep the dividends, but that Hurley had never executed the assignment. He says the Company was put on notice when it sent the assignment back to the Kansas City bank the second time, and received back the assignment form with alterations inserted above the signatures. He says the apparent loathness to guarantee Hurley's signature the first time, and the alteration without any apparent new execution, should have been sufficient to warn the Company to make further inquiries.

█ While these circumstances are not without validity as evidence of notice, we think that it would be for the trial court to consider its weight, as it considered the question of fact here involved. The finding that the Company had no actual knowledge, and no reason to believe, that his grandmother had perpetrated the fraud upon Hurley, is a finding which we cannot hold clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

Appellant contends, however, that the Company is chargeable with notice as a matter of law, because it accepted and acted upon the forged assignments. His reasoning is this: a forgery is wholly ineffective to create or alter any rights. One who accepts a forged transfer, whether in ignorance or otherwise, is prohibited from acting thereon. He must, at his peril, ascertain the genuineness of the signature. So, a corporation is bound to know the signature of a stockholder, and in this case, the Company was bound to know that the signature on the assignments was not that of Hurley. Therefore, it is said, the moment it took the forged documents, the Company was charged with constructive or imputed notice of fraud.

█ Assuming, as we do at this stage of the opinion, that the assignments were in fact forged, (we shall discuss this question later), we think it unnecessary to determine whether there be any authority which announces such a rule, at least in terms which would say that when the Company paid the dividends to Mrs. Price it had notice, constructive or otherwise, that she held the stock through forgery. We do think it is accurate to say that at all those times the Company was under a continuing duty to treat Hurley as a stockholder, a duty which began when he first acquired his interest, and which the forgery was wholly ineffective to terminate. The situation of the Company was comparable to that of the person who purchases a chattel from one not the owner. This was stated in Western Union Telegraph Company v. City of Davenport, 97 U.S. 369, 372, 24 L.Ed. 1047, where, in speaking of trans-

6. Less than two months after its decision in Cober v. Connolly, supra, the California Supreme Court decided Stark v. Coker, 20 Cal.2d 839, 129 P.2d 390, 394. In that case a note for $12,000 made payable to a husband and wife as joint tenants, was claimed to have been discharged by the wife alone for $3000, only half of which was paid in cash. The husband sued the maker of the note and recovered a judgment for $6000 as his half of the full amount of the note. The judgment was affirmed, partly on the finding, based on the testimony of the wife, that there was no accord and satisfac-

tion. But the court, although quoting section 1475, stated as a further reason for its decision: "Second, even if an accord and satisfaction was accomplished by Hilda Stark, it was not under the rules above discussed binding upon plaintiff as to his half interest in the obligation." We find this statement somewhat difficult to reconcile with the statement made in Cober v. Connolly, by way of quotation from Williston, that "Since each of several joint obligees is interested in the entire claim, he has the power to discharge the entire claim either by release or by accord and satisfaction * * *."

fers of stock based on forged assignments presented to company officers, the court said: "In many instances they may be misled without any fault of their own, just as the most careful person may sometimes be induced to purchase property from one who has no title, and who has perhaps acquired its possession by force or larceny. Neither the absence of blame on the part of the officers of the company in allowing an unauthorized transfer of stock nor the good faith of the purchaser of stolen property, will avail as an answer to the demand of the true owner. The great principle that no one can be deprived of his property without his assent, except by the processes of law, requires in the cases mentioned, that the property wrongfully transferred or stolen should be restored to its rightful owner. The maintenance of that principle is essential to the peace and safety of society, and the insecurity which would follow any departure from it would cause far greater injury than any which can fall, in cases of unlawful appropriation of property, upon those who have been misled and defrauded."

In attempting to determine whether section 1475 protects the Company in the payments here made we find ourselves confronted with the necessity of resolving an exceedingly difficult problem which has caused us much concern. On the one hand it can be said that the person who received the dividends was a person to whom they could rightly be paid, even though no dividend orders or assignments had ever been filed. How, it is asked, can payment to the very person who in any event could have given a complete discharge, fail to satisfy the Company's obligation?

On the other hand, we must consider the fact that when the dividends were paid to Mrs. Price the Company must have known from the circumstances that no portion of these sums would ever reach Hurley. And yet, at the moment of payment the Company was under an obligation, which transcended all questions of good faith, lack of notice or of good intent, to treat Hurley as its stockholder and perform its obligations to him as such.

We think that the rule, statement of which is found in section 1475, is one which should have effect so long, and only so long, as the obligor may rightly assume that the one obligee to whom performance is furnished will account to the others. But the authorities to which we have referred indicate that whenever the obligor has reason to know that the recipient will alone receive benefit from the performance, and will not account to the others, his obligation is not thereby discharged.

Here the Company had such knowledge. It knew Mrs. Price intended to, and would keep the money. It is true it also supposed that Hurley was no longer a joint owner, but if the signatures were in fact forged, this was a supposition it had no right to entertain. If it acted on such a premise, it did so at its peril. We hold, therefore, if the assignments of the 575 shares were forged, then section 1475 does not furnish the Company with a defense as to its payment of dividends and delivery of rights on account of those shares.

The Company contends that it is not liable to plaintiff irrespective of section 1475. It undertakes to show that a judgment in its favor is compelled by the whole record, and to underscore this argument specifies other errors. It asserts that the dividend orders which Hurley signed were valid until canceled, and constituted a full protection to the Company, and that Hurley could not disaffirm them after Mrs. Price's death so as to charge the Company retroactively with moneys paid by it pursuant to their direction.

The district court concluded that under the law, both of California and of Missouri, the orders were voidable at the election of the minor manifested within a reasonable time after reaching his majority. It held that since Hurley received no consideration for signing, and since their nature and purpose were concealed from him, (the court found that until March 18, 1944, Hurley did not know he had any interest in the Company's stock), Hurley's disaffirmance of the dividend orders on March 20, 1944, was made within a reasonable time after reaching his majority.

█ We think that in these conclusions the court was right. The court held that the validity of the dividend orders must be determined by the law of Missouri, where they were executed. Appellee takes issue with this, and cites, among other authorities, Restatement, Conflict of Laws, sec. 183, which provides: "The right of a shareholder to participate in the administration of the affairs of the corporation, in the division of profits and in the distribution of assets on dissolution and his rights on the issuance of new shares are determined by the law of the state of incorporation."

█ We think it unnecessary to determine which law governs, as the rule with respect to disaffirmance of infant's contracts is the same in either state. California Civil Code, Section 35, provides: "In all cases other than those specified in sections thirty-six and thirty-seven, the contract of a minor, if made whilst he is under the age of eighteen, may be disaffirmed by the minor himself, either before his majority or within a reasonable time afterwards; or, in case of his death within that period, by his heirs or personal representatives; and if the contact be made by the minor whilst he is over the age of eighteen, it may be disaffirmed in like manner upon restoring the consideration to the party from whom it was received, or paying its equivalent." What constitutes a "reasonable time" depends upon the circumstances of each particular case. Hastings v. Dollarhide, 24 Cal. 195. The reason for this grant of a reasonable time was stated in Goodnow v. Empire Lumber Co., 31 Minn. 468, 18 N.W. 283, 284, 47 Am.Rep. 798, as follows: "For this purpose of protection the law gives them an opportunity, after they have become capable of judging for themselves, to determine whether such acts or obligations are beneficial or prejudicial to them, and whether they will abide by or avoid them." Under the circumstances of this case, Hurley had no opportunity to exercise any judgment upon the matter un-til he learned he had some interest in the stock. Until then, a reasonable time had not elapsed.

█ The effect of such a disaffirmance, when made, is the same as if the act disaffirmed had never occurred,—it is deemed void *ab initio*. Flittner v. Equitable Life Assur. Soc., 30 Cal.App. 209, 157 P. 630. The net effect is that one who deals with an infant does so at his peril, and may suffer loss through having to pay the same amount over again after disaffirmance. Pollock v. Industrial Accident Commission, 5 Cal.2d 205, 54 P.2d 695. Such is the law generally. See Sternlieb v. Normandie Nat. Securities Corp., 263 N.Y. 245, 188 N.E. 726, 90 A.L.R. 1437. It is the law of Missouri. Robison v. Floesch Const. Co., 291 Mo. 34, 236 S. W. 332, 20 A.L.R. 1239. The infant's disaffirmance renders his contract "void *ab initio*". Windisch v. Farrow, Mo.App., 159 S.W.2d 392; Phillips v. Savings Trust Co., 231 Mo.App. 1178, 85 S.W.2d 923.

█ Appellee contends that the reasonable time for disaffirmance may not exceed the period of the statute of limitations, and cites cases which it asserts so hold. In all those cases, with one exception, the infant knew of his rights immediately upon reaching his majority. None are California or Missouri decisions. In a case where the infant has complete knowledge of his rights, it is not amiss to hold that the period of the statute of limitations, by analogy furnishes a guide as to what is the limit of a reasonable time.[7] We think they furnish no standard to be applied here. And in the one case cited where the person on coming of age was without knowledge of his ownership, Lanning v. Brown, 84 Ohio St. 385, 95 N.E. 921, 922, Ann.Cas.1912C, 772, the point was not decided, for the statutory period there had not expired. On the other hand, in that case, the claimant's complete ignorance of his ownership was held important as showing that his acts which would otherwise have been a confirmation of his deed

---

7. A similar use of the period of limitations for actions at law, by way of analogy, was employed by courts of equity in dealing with the defense of laches. Story, Equity Jurisprudence, 14th Ed., secs. 65, 1972.

made while an infan., had no such effect, the court saying: "It seems to be the law that to confirm or ratify one must have knowledge of the matter or transaction to be confirmed or ratified."

We think the court properly held that in view of Hurley's complete ignorance of his rights during the lifetime of Mrs. Price, his disaffirmance was in a reasonable time.

This disposes of the claimed defenses under the statute of limitations, Cal.Code of Civil Procedure, Sec. 337, subd. 1, and Sec. 339, subd. 1. For until the disaffirmance and the demand, Hurley's cause of action had not arisen or matured. Mac-Dermot v. Hayes, 175 Cal. 95, 170 P. 616; Ralston v. Bank of California, 112 Cal. 208, 44 P. 476.

■ We need next to determine whether, as to the 88 shares of common and the 191 shares of preferred stock, the Company's payment of dividends to Mrs. Price was authorized by section 1475, notwithstanding the dividend order describing this stock was subject to disaffirmance. What we have said concerning the availability of this section as a defense with respect to the dividends on the 575 shares does not apply here, for the mere execution and presentation of this dividend order would not negative an intention on the part of Mrs. Price to account to the other joint owners for the dividends received. Such an order might well be understood to serve only as a convenient device to expedite and simplify the payment of the dividends. We find here no such notice of an intention not to account, as we think was effected by the filing with the Company of the forged assignment in the case of the 575 shares. We think that so far as these shares are concerned, the court's conclusion that the defendant discharged its obligation by the payments to Elizabeth J. Price, is correct.

Appellant's assertion that the dividends, when declared and set aside, became "deposits", and hence within the exception of Section 1475, does not appear to find support in any decided cases. On the other hand, the California Code definitions of deposits would appear to us to exclude such declared dividends.[8]

■ Nor do we find any merit in appellant's contention that the defense of payment under section 1475 was not available because not pleaded. Hurley's own complaint alleged the joint tenancy, and alleged that the dividends were paid, and the stock rights delivered, to Mrs. Price, one of the joint tenants. Whether such payment and delivery operated to discharge the Company was, upon the facts thus pleaded, purely a question of law. This question was plainly presented for the court's determination by the Company's "Memorandum of Points and Authority in Support of Pretrial Order", which recited: "The payment by defendant of the dividends accruing to one of the several joint owners of the stock discharged defendant's liability to all of said owners." In support were cited Section 1475, and Cober v. Connolly, supra, and Delano v. Jacoby,

8. "Sec. 1813. Deposit, kinds of. A deposit may be voluntary or involuntary; and for safekeeping or for exchange.

"Sec. 1814. Voluntary deposit, how made. A voluntary deposit is made by one giving to another, with his consent, the possession of personal property to keep for the benefit of the former, or of a third party. The person giving is called the depositor, and the person receiving the depositary.

"Sec. 1815. Involuntary deposit, how made. An involuntary deposit is made:

"1. By the accidental leaving or placing of personal property in the possession of any person, without negligence on the part of its owner; or,

"2. In cases of fire, shipwreck, inundation, insurrection, riot, or like extraordinary emergencies, by the owner of personal property committing it, out of necessity, to the care of any persons.
* * *

"Sec. 1817. Deposit for keeping, what. A deposit for keeping is one in which the depositary is bound to return the identical thing deposited.

"Sec. 1818. Deposit for exchange, what. A deposit for exchange is one in which the depositary is only bound to return a thing corresponding in kind to that which is deposited."

96 Cal. 275, 31 P. 290, 31 Am.St.Rep. 201. The court treated these matters as properly in issue, and since the record here does not contain the evidence or the proceedings at the trial, we must assume that if there had been any original defect in the answer it may have been supplied in the manner authorized by Rule 15(b), F.R.C.P.

It remains to determine whether the record here supports a decision that Hurley's signatures on the assignments of the 575 shares of stock were forged. The court's findings and conclusions show that the district court's determination of such forgery was based solely upon its finding and conclusion that the judgment of the United States District Court for the District of Kansas was res judicata. Since no portion of the evidence is before us in this record, we are not advised as to whether the parties in the trial below undertook to introduce evidence as to the validity of the signatures.[9]

Appellee challenges the court's determination that the former judgment that the signatures were forged, is res judicata as to it. Since our holding that section 1475 does not constitute a defense with respect to the claim for dividends on the 575 shares is predicated upon the assumption that the signatures on the assignments were forged, we must now necessarily inquire whether that judgment is in fact final, binding and res judicata as against the Company.

The court's holding that it was appears to be based upon the decision in Perkins v. Benguet Consol. Mining Co., 55 Cal. App.2d 720, 132 P.2d 70. This case was cited in the court's conclusion upon this point. It seems clear that the controlling decisions are the case just cited, and the

case of Bernhard v. Bank of America Nat. Trust & Savings Ass'n, 19 Cal.2d 807, 122 P.2d 892, which is reviewed in the Perkins case.

It would appear at first blush that the earlier judgment ought not to be res judicata as against the Company, which was not a party to the former suit, nor a privy to any party within any definition of that term.[10] It is not difficult to understand how the district court was persuaded by the decision in the Perkins case, supra, that the doctrine of res judicata was applicable here, for in the Perkins case that rule was applied to a state of facts which in many respects were similar to the facts here involved. In that case the dispute as to the ownership of corporate stock was between husband and wife. The defendant corporation was sued by the wife to recover dividends on the stock. The court held that the issue as to title to the stock had been settled by final judgment of the New York courts, which held that the wife was the owner of the stock and entitled to the dividends, notwithstanding the defendant corporation was not a party in that action. For some years prior to the final decision in the New York action, the corporation paid all dividends to the husband notwithstanding it knew at all those times that the wife was claiming the stock and the dividends. The corporation, however, elected to pay the dividends to the husband, (who happened to be general counsel for the company), and to take from him indemnity against losses on account of such payments. After the date of the New York judgment, the dividends were impounded.

The decision that the corporation was bound by the judgment in the New York courts, both in respect to the impounded

---

9. It would appear that the district court did receive evidence as to the genuineness of Hurley's signature on the dividend orders for it held contrary to what was said in the district court for Kansas that these signatures were genuine. The findings of the District Court for the District of Kansas upon these signatures were considered gratuitous since the signatures on the dividend orders were not in issue in that court.

10. The findings show that when Burton brought the former action he attempted to join Southern California Edison Company as an additional defendant. The Company had not been served in the District of Kansas and its motion to quash service of process upon it was sustained.

dividends and those which it had chosen to pay to the husband, was predicated upon the finding that the corporation, with full knowledge of the wife's claims, had chosen to take sides in the dispute and thereby had placed itself in a situation where it ought to be treated as though it were a privy. It was conceded that the corporation was not a privy under the usual definition but it was said that the situation obviously called for application of the doctrine of res judicata as fully as in the typical cases where privity exists, such as those of landlord and tenant, principal and agent, master and servant, bailor and bailee. The court said, 55 Cal.App.2d 749, 132 P.2d 88: "A corporation, when such a dispute arises, is not required to determine at its peril who is entitled to the dividends. It could have impounded all dividends until the dispute was settled, or could have interpleaded the disputants. If it elects to pay one of the disputants, it should be in no better or different legal position than if it had pursued the obvious and more careful courses suggested above. By taking sides in the dispute, that is, by paying to one of the disputants, it should gain no rights that it would otherwise not possess. If a judgment determining title to stock and the right to impounded dividends is res judicata, as already held, there is no principle of logic, fairness or equity that does not compel a like conclusion where the dividends are paid out under facts such as exist here. If a corporation has no adverse interest in an action between two disputants over title to its stock, it cannot gain such an adverse interest by choosing sides in the controversy and paying the dividends to one of the disputants with full knowledge of the other's claims."

The court reviewed at considerable length the decision of the California Supreme Court in Bernhard v. Bank of America Nat. Trust & Savings Ass'n, supra, to which we shall presently make further reference, and indicated that if the corporation had paid the husband without knowledge of the wife's claim, then an entirely different result would have been reached so far as applying the rule of res judicata is concerned. The court said, 55 Cal.App. 2d at page 753, 132 P.2d at page 90: "The basic reason why this assumption, made in the Bernhard case, is not in point in the instant case, is that in that case the bank acted without knowledge of the competing claims. It paid A, whom it believed to be rightfully entitled. It had no knowledge of the claims of B. We can agree with defendant and with the assumption made in the Bernhard case that, in such a case, where the depositary has paid one person without knowledge of another's claim, a judgment between the two disputants would not be conclusive against the depositary."

We think that the language just quoted discloses the reason why the decision of the District Court for the District of Kansas should not be held conclusive as to the Company in this case. For here, as the court has found, the Company had neither actual knowledge of what had transpired nor any reason to believe that any fraud had been perpetrated. When the dividends in question were paid the Company here was without knowledge and without reason to suspect that Hurley had any interest adverse to that of Mrs. Price or that his claims were such that the dividend ought not to be paid to Mrs. Price. Of course, as we have indicated, if the assignments were forged, the Company could act upon such forgeries only at its peril. It was obliged to ascertain the genuineness of its stockholder's signature. The consequences of this is somewhat the same as what results from constructive notice or knowledge. But the very issue which is the key to the problem here is whether the Company should or should not be so charged. We cannot say that it is so charged because the signatures were forged, and the signatures must be held to be forged because the former judgment to that effect must be held binding upon the Company since the Company is charged with the equivalent of notice of the forgery! We therefore are of the opinion that the decision in the Perkins case, supra, does not require a conclusion that the former judgment is res judicata. On the

contrary, we think this case is within the exception which the court there made known.

An examination of Bernhard v. Bank of America Nat. Trust & Savings Ass'n, supra, confirms us in this view. In that case A and B each claimed the same deposit in the defendant bank. The bank had paid the deposit to A. Thereafter in a judgment in a proceeding between A and B to which the bank was not a party, it was held that A was the owner of the deposit. B then sued the bank for the money and it was held that the bank might plead the judgment in favor of A in justification of its own action in paying A. The court held that under the circumstances there involved, the traditional requirements of mutuality and of privity would be discarded. Overruling some earlier decisions, the court stated the rule it was applying as follows: "In determining the validity of a plea of res judicata three questions are pertinent: Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party *against whom* the plea is asserted a party or in privity with a party to the prior adjudication?" [19 Cal.2d 807, 122 P.2d 895] (Emphasis supplied.) The emphasis which we have supplied in the foregoing quotation gives the clue to that decision, in which it is made apparent that while the bank could use the former judgment as a defense, it is also indicated that had the bank paid B, and A then sued the bank, the same judgment could not have been used against it.

What this means here is that if the Company had paid Hurley the dividends and had then been sued by Mrs. Price and Burton for them, the Company might have pleaded the former judgment in favor of Hurley in its own defense. But that is not the situation here where Hurley has attempted to use the former judgment to which the Company was not a party in support of his own claim against the Company. This is exactly what it was suggested in the Bernhard case, supra, could not be done.

We are therefore of the opinion that it was open to the parties in the court below to litigate the question as to the genuineness of Hurley's signatures on the assignments and that it was the duty of the trial court to determine that question without regard to the decision in the United States District Court for the District of Kansas. The cause must therefore be remanded with directions to the district court to grant the parties further opportunity to be heard upon this issue and make proper findings based upon the court's own determination of the facts with respect to such purported assignments and the validity thereof.

If the finding be that the signatures were genuine, then upon the record as it now stands (see closing paragraph of this opinion), the result reached with respect to the dividends and stock rights from the 575 shares must be the same as for the dividends and stock rights from the other shares. For even if the Company can be said to be chargeable with knowledge that Hurley was a minor, it cannot be said that it had any reason to believe that he was at all these times ignorant of his ownership. If he actually signed the assignments, that fact might well suggest to the Company that he did know. Practically all of the dividends were paid after Hurley must have been of age, and at times when the Company could not have any reason to anticipate any disaffirmance by him.

The cause is remanded to the District Court with instruction to proceed as indicated in this opinion in regard to the genuineness of Hurley's signatures on the assignments. Since it may be that the consideration of the issue just mentioned will persuade the court that its findings on other issues should be changed, we do not at this juncture affirm in part but return the cause without restraint other than that such further proceedings of the court shall not be inconsistent with this opinion.

The judgment therefore is reversed and the cause remanded.

On Petition for Rehearing

PER CURIAM.

By its petition for rehearing the appellee company makes the contention, among others, that in holding that Hurley had the right to disaffirm the dividend orders executed by him, we overlooked the rule stated in Section 170(2)c of the Restatement of the Law of Contracts as follows:

"(2)  Except as stated in Subsection (4) an obligor is discharged from any duty to the obligee or to any assignee, if he obtains for value, by performance or otherwise, a discharge of the duty

\* \* \*

(c)  from any holder of an assignment voidable by the assignor because of infancy, insanity, fraud, duress, mistake or illegality, if the discharge is obtained in good faith prior to avoidance of the assignment by the assignor, and the obligor neither knows nor has reason to know facts showing that the assignment is voidable."

These dividend orders, the Company says, were in effect assignments of the debt, and hence, it is argued, the Company should be protected by its payments to Mrs. Price, and no subsequent effort to disaffirm the orders should result in charging the company.

We are not impressed with the argument that the orders were assignments, but we think it unnecessary to determine that question, because of the facts found in the trial court's finding No. XII, as follows: "The dividends and stock rights listed above in Paragraph XI in the total sum of $20,458.50 were paid and delivered by defendant to Elizabeth J. Price under dividend order No. 13157 during the period from February 19, 1929 until the death of Elizabeth J. Price on December 27, 1943."

Dividend order No. 13157 was the order signed by Mrs. Price and Burton alone, after they had received the allegedly forged assignment of the 575 shares. (In the opinion this was described as an order which "Burton had executed" to Mrs. Price "after the purported assignment".)

It thus appears that the dividends paid on the 575 shares were not paid pursuant to any order signed by Hurley. Indeed, they could not well have been, for as disclosed in footnote 1 of the opinion, Hurley's order referred to dividends on stock "standing in the names of Mrs. Elizabeth J. Price and George E. Burton and Lester Hurley on the books of your company." After the 575 shares had been transferred on the books to Burton and Price alone, this order would no longer describe these shares. The finding above quoted shows that after the receipt of the purported assignment, the dividend order previously received bearing Hurley's signature became *functus officio*.

Because the company did not, when it paid the dividends, do so in reliance on Hurley's order, it cannot now rely upon it as a defense.

As we think the points urged in the petition are without merit, a rehearing is denied.